**UNITED STATES DISTRICT COURT**
**MIDDLE DISTRICT OF FLORIDA**
**ORLANDO DIVISION**

**UNITED STATES EQUAL EMPLOYMENT**
**OPPORTUNITY COMMISSION,**

**Plaintiff,**

**FREDERICK RIVERS, CARLTON C. SMALL,**
**SEYMOUR S. SMALL, SYLVESTER A. COLE,**
**JR., and RICKEY WILLIAMS,**

**Intervenor-Plaintiffs,**

**-vs-**                                              **Case No. 6:05-cv-1452-Orl-28KRS**

**FLTVT, LLC,**

**Defendant.**
_____

# ORDER

This cause is before the Court on Defendant's Motion for Summary Judgment (Doc. 48), in opposition to which Plaintiffs have filed a Response (Doc. 52).[1]  Having considered the parties' submissions and applicable law, the Court concludes that the motion must be granted in part and denied in part.

## I.  Background

The Intervenor-Plaintiffs, all of whom are African-American, were formerly employed by Defendant at an automobile dealership.  At the time of the events pertinent to this lawsuit,

_____

[1]Additionally, with leave of Court (see Docs. 54 & 55), Defendant has filed a Reply (Doc. 56) to Plaintiffs' Response.

the dealership was known as Magic Toyota ("Magic").[2]  It is undisputed that the Intervenor-Plaintiffs were employed at Magic as follows:

- Frederick Rivers was hired as a new car sales manager on or about January 18, 2003;
- Carlton Small was hired as a salesperson on or about July 20, 2001 and was promoted to Assistant Sales Manager on or about March 14, 2003;
- Seymour Small was hired as a salesperson on or about May 25, 1997 and was promoted to Assistant Sales Manager on or about March 4, 2003;
- Sylvester Cole was hired as a Finance and Insurance Manager on approximately February 1, 2000; and
- Rickey Williams was hired as Lead Assistant Sales Manager on or about March 5, 2003.

(Statement of Admitted Facts, Joint Pretrial Statement, Doc. 60 at 12-13).  In early May 2003, Rivers, Carlton Small, Cole, and Williams were terminated; they were given termination notices stating that "[d]ue to current business levels, we decided it was necessary to reduce our current management force" and that each plaintiff's "personnel file should reflect that his termination was due to a reduction in a workforce, effective immediately."  (Termination Notices, Pls.' Ex. 27).[3]  At that same time, Plaintiff Seymour Small was demoted from the position of Assistant Sales Manager to salesman.  (See Dep. of Brian Penniman, Mar. 9, 2007, Def.'s Ex. 14, at 138).  Although Defendant asserts that its termination and demotion of the Intervenor-Plaintiffs was due to economic reasons, Plaintiffs maintain that they were terminated and demoted based on their race.

The United States Equal Employment Opportunity Commission ("EEOC") initiated this

---

[2]The dealership has since been renamed David Maus Toyota.

[3]Plaintiff's summary judgment exhibits are attached to their Response (Doc. 52).

action in September 2005 by filing a Complaint (Doc. 1) alleging that Defendant engaged in unlawful discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. ("Title VII"), when Defendant terminated or demoted Seymour Small, Carlton Small, Frederick Rivers, Sylvester Cole, "and at least one other similarly situated individual." (See Doc. 1 at 1).[4]  Seymour Small, Carlton Small, Rivers, Cole, and Rickey Williams successfully moved to intervene (see Docs. 9 & 14) and filed a Complaint (Doc. 17) bringing claims under both Title VII and the Florida Civil Rights Act of 1992, sections 509.092, 760.01-.11, Florida Statutes ("the FCRA").[5]  The Intervenor-Plaintiffs bring claims of discriminatory termination and demotion as well as claims of a hostile work environment based on "[t]he use of racial epithets and slurs, as well as racially-oriented jokes" during their employment (Doc. 17 ¶¶ 34 & 43).[6]

## II.  Discussion

### A.  Summary Judgment Standards

Summary judgment "shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there

---

[4]The EEOC's Complaint did not mention Rickey Williams.

[5]Courts consistently apply case law interpreting Title VII to claims under the FCRA because the FCRA is patterned after Title VII.  See, e.g., Wilbur v. Corr. Servs. Corp., 393 F.3d 1192, 1195 n.1 (11th Cir. 2004).  Hence, the discussion of the Title VII claims in this Order applies equally to the FCRA claims, and the FCRA claims will not be addressed separately.

[6]Cole also brought a defamation claim.  (See Intervenors' Compl., Doc. 17 at 10-11).  However, that claim has been dismissed by agreement of the parties.  (See Docs. 51 & 53).

is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). The moving party bears the burden of establishing that no genuine issues of material fact remain. <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317 (1986).

When faced with a "properly supported motion for summary judgment, [the nonmoving party] must come forward with specific factual evidence, presenting more than mere allegations." <u>Gargiulo v. G.M. Sales, Inc.</u>, 131 F.3d 995, 999 (11th Cir. 1997). "The evidence presented cannot consist of conclusory allegations or legal conclusions." <u>Avirgan v. Hull</u>, 932 F.2d 1572, 1577 (11th Cir. 1991); <u>see also</u> Fed. R. Civ. P. 56(e) (providing that nonmovant's response "must set forth specific facts showing that there is a genuine issue for trial").

In ruling on a motion for summary judgment, the Court construes the facts and all reasonable inferences therefrom in the light most favorable to the nonmoving party. <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242 (1986). However, summary judgment is mandated "against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." <u>Celotex</u>, 477 U.S. at 322. Moreover, "at the summary judgment stage the judge's function is not himself to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." <u>Anderson</u>, 477 U.S. at 249.

"Summary judgment may be granted if the non-moving party's evidence is merely colorable or is not significantly probative." <u>Sawyer v. Sw. Airlines Co.</u>, 243 F. Supp. 2d 1257, 1262 (D. Kan. 2003) (citing <u>Anderson</u>, 477 U.S. at 250-51). "'In a response to a motion for

summary judgment, a party cannot rely on ignorance of facts, on speculation, or on suspicion, and may not escape summary judgment in the mere hope that something will turn up at trial.'   Essentially, the inquiry is 'whether the evidence presents a sufficient disagreement to require submission to the jury or whether it is so one-sided that one party must prevail as a matter of law.'" Id. (quoting Conaway v. Smith, 853 F.2d 789, 794 (10th Cir. 1988) and Anderson, 477 U.S. at 251-52); see also LaRoche v. Denny's, Inc., 62 F. Supp. 2d 1366, 1371 (S.D. Fla. 1999) ("The law is clear . . . that suspicion, perception, opinion, and belief cannot be used to defeat a motion for summary judgment.").  "[T]he summary judgment rule applies in job discrimination cases just as in other cases.  No thumb is to be placed on either side of the scale." Chapman v. AI Transp., 229 F.3d 1012, 1026 (11th Cir. 2000).

B.  The Merits of Defendant's Motion

1.  Disparate Treatment

Defendant contends that it is entitled to summary judgment on Plaintiffs' discriminatory termination and demotion claims.  However, these claims cannot be resolved at this stage of the case.

"A plaintiff in a Title VII discrimination case can avoid summary judgment in one of two ways.  He must either (a) present direct evidence of discrimination or (b) present circumstantial evidence sufficient to shift the burden of producing contrary evidence to the defendant under the analytical framework set out in McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802-04 (1973)." Toney v. Montgomery Jobs Corps, 211 Fed. Appx. 816, 817 (11th Cir. 2006) (citing Morris v. Emory Clinic, Inc., 402 F.3d 1076, 1081 (11th Cir. 2005)) (parallel

citation omitted).  In the instant case, Plaintiffs can, and do, avoid summary judgment via the first of these alternatives.[7]

"Direct evidence is 'evidence, that, if believed, proves [the] existence of [a] fact without inference or presumption.'"  Morris, 402 F.3d at 1081 (citing Wilson v. B/E Aerospace, Inc., 376 F.3d 1079, 1086 (11th Cir. 2004)) (alterations in original).  "[D]irect evidence relates to actions or statements of an employer reflecting a discriminatory or retaliatory attitude correlating to the discrimination or retaliation complained of by the employee.'"  Carter v. Three Springs Residential Treatment, 132 F.3d 635, 641 (11th Cir. 1998) (quoting Caban-Wheeler v. Elsea, 904 F.2d 1549, 1555 (11th Cir. 1990)) (alteration in original).

Although the standard in the Eleventh Circuit for what constitutes "direct evidence" is rigorous, Plaintiffs have presented this type of evidence through the deposition testimony and sworn statement of William Smalley, the former general sales manager at Magic.  Smalley stated in his sworn statement that in closed-door meetings beginning a month prior to Plaintiffs' terminations and demotion, Brian Penniman, the general manager at Magic, stated that "he had a problem with niggers in management . . . and we had to look at getting rid of them here, here being Magic Toyota."  (Sworn Statement of William Smalley, Oct. 23, 2003, Pls.' Ex. 20, at 16-17).  Smalley described a plan "to find a way [that] [the Plaintiffs] would be terminated, but [they] also had to find a way to balance that termination with four other employees"; "[i]t had to be done in a way so that nobody would come back on the dealership and file suit against them."  (Id. at 17-18).  Additionally, Smalley stated that "it was

_____

[7]As noted infra, Plaintiffs also would survive summary judgment under the McDonnell Douglas framework.  See note 8.

discussed that if we find four whites to balance it and then offer Seymour [Small] to demote him, Seymour would probably leave.  The four whites were basically chosen at random." (Id. at 19).

Smalley testified in his deposition that Penniman endorsed "a sacred plan to fire black managers" and to demote Plaintiff Seymour Small, and "the plan specifically targeted those individuals because of their race." (Dep. of William Smalley, Feb. 6, 2007, Pls.' Ex. 12, at 330).  "[T]his plan was discussed over a period of time" with Penniman, and "[t]he only reason those black managers were fired is because of their race."  (Id. at 331, 333).

The discussions and statements about which Smalley has testified constitute direct evidence of discrimination because they are statements of a decisionmaker made in the context of the termination and demotion decisions.  Cf. Standard v. A.B.E.L. Servs., Inc., 161 F.3d 1318, 1330 (11th Cir. 1998) ("[R]emarks by non-decisionmakers or remarks unrelated to the decisionmaking process itself are not direct evidence of discrimination.").  If believed by a jury, this testimony would prove discriminatory motive without inference or presumption. In light of this direct evidence, Plaintiffs' discriminatory termination and demotion claims survive summary judgment.[8]

_____

[8]Because of the direct evidence presented, the Court need not address the application of the McDonnell Douglas analysis or the issue of pretext evidence.  See Merritt v. Dillard Paper Co., 120 F.3d 1181, 1191 (11th Cir. 1997) (reversing grant of summary judgment to employer were plaintiff had presented direct evidence and noting that because plaintiff had "presented sufficient direct evidence to survive summary judgment, [the court would] not address his McDonnell Douglas argument and whether he ha[d] presented evidence of pretext").  In any event, Plaintiffs' disparate treatment claims would survive summary judgment under the McDonnell Douglas framework as well.  A plaintiff may make a prima facie showing of disparate treatment by establishing that: "(1) he is a member of a protected class; (2) he was qualified for the position; (3) he suffered an adverse employment action;

2.  Hostile Work Environment

The Intervenor-Plaintiffs also include in their Complaint – though not as a separate count – allegations of a hostile work environment.  (See Doc. 17 ¶ 34 ("The use of racial epithets and slurs, as well as racially-oriented jokes, was prevalent at [the dealership] during the time all of the Plaintiffs/Intervenors worked there and created a hostile work environment for Plaintiffs/Intervenors.")).  While the conduct forming the basis of this claim is offensive, it nevertheless fails to meet the rigorous standard for a hostile work environment claim.  The Defendant's motion for summary judgment on this claim therefore must be granted.

To establish a Title VII hostile work environment claim, a plaintiff must show:  "(1) that he belongs to a protected group; (2) that he has been subject[ed] to unwelcome harassment; (3) that the harassment [was] based on a protected characteristic of the employee . . . ; (4) that the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment; and (5) that the employer is responsible for such environment under either a theory of vicarious or of direct liability."  Miller v. Kenworth of Dothan, Inc., 277 F.3d 1269, 1275 (11th Cir. 2002).  Plaintiffs

---

and (4) he was replaced by a person outside his protected class or was treated less favorably than a similarly-situated individual outside his protected class."  Maynard v. Bd. of Regents, 342 F.3d 1281, 1289 (11th Cir. 2003).  Plaintiffs have done so here because (1) the Intervenor-Plaintiffs belong to a protected class; (2) they were qualified for their positions; (3) they were terminated or demoted; and (4) there is evidence that they were replaced by white employees shortly after their positions were allegedly eliminated or, with regard to Seymour Small, that he was treated less favorably than white employees.  (See, e.g., Sworn Statement of William Smalley, Pls.' Ex. 20, at 24, 30).  In response to the prima facie case, Defendant has articulated a legitimate nondiscriminatory reason for its terminations and demotion of Plaintiffs – the elimination of Plaintiffs' positions in order to cut expenses. However, the veracity of this reason is much in dispute, and the record evidence would require a trial under the McDonnell Douglas framework.

have not presented evidence revealing the presence of a genuine issue of fact or law on their hostile work environment claim, and under the law of the Eleventh Circuit it does not survive summary judgment.

The Intervenor-Plaintiffs satisfy the first element because they belong to a protected class, and the third, element – "based on race" – is also met.  However, even assuming that the second element is satisfied,[9] the claim fails on the fourth element – that "the harassment was sufficiently severe or pervasive to alter the terms and conditions of employment and create a discriminatorily abusive working environment."  See id.  "This requirement, as defined by the Supreme Court, contains both an objective and a subjective component.  Thus, to be actionable, this behavior must result in both an environment 'that a reasonable person would find hostile or abusive' and an environment that the victim 'subjectively perceive[s] . . . to be abusive.'"  Id. at 1276 (citations omitted) (alteration in original).  "Conduct that is not severe or pervasive enough to create an objectively hostile or abusive work environment – an environment that a reasonable person would find hostile or abusive – is beyond Title VII's purview.  Likewise, if the victim does not subjectively perceive the environment to be abusive, the conduct has not actually altered the conditions of the victim's employment, and there is no Title VII violation."  Harris v. Forklift Sys., Inc., 510 U.S. 17, 21-22 (1993).  Under these controlling principles, none of the Intervenor-Plaintiffs can meet the standard of a subjectively and objectively abusive work environment.

The summary judgment evidence establishes that two of the Intervenor-Plaintiffs

––––––––––––––––––––––

[9]As noted in the text infra, some of the Intervenor-Plaintiffs did not hear any racial comments or witness any racial incidents.

never heard any racial epithets or experienced any racially-charged incidents at the dealership. Plaintiff Carlton Small testified in his deposition that he never heard anyone say anything to him or anyone else that he found racially offensive or negative. (Dep. of Carlton Small, Feb. 27, 2007, Def.'s Ex. 9, at 36-37). Plaintiff Rickey Williams similarly testified that he never heard any offensive racial comments at the dealership, and the only thing that Williams identified as racially inappropriate was his termination. (Dep. of Rickey Williams, Feb. 23, 2007, Def.'s Ex. 8, at 106-07). A third Plaintiff, Seymour Small, testified in his deposition that the only racially derogatory comments he heard at the dealership were by a salesperson, on only one occasion, just after Seymour Small was demoted. (Dep. of Seymour Small, Feb. 21, 2007, Def.'s Ex. 10, at 117-19). Seymour Small complained to Brian Penniman about the comments that the salesperson made, and after his complaint Small did not hear any further comments. (Id. at 119-20).

The other two Intervenor-Plaintiffs, Rivers and Cole, present stronger claims, each testifying in his deposition that he heard some racial comments. Rivers testified that the used car director, who is white, was known around the dealership as "the slave master" because most of his staff was black; according to Rivers, this nickname was used "a few times," by several different people. (Dep. of Frederick Rivers, Feb. 28, 2007, Pls.' Ex. 6, at 144-45, 160-62). Rivers also heard the finance and insurance manager, Jeff Coleman, refer to customers as "moolies," "camel jockeys," and "chinks." (Id. at 156-57). Rivers told Coleman that his use of those words offended him, and Coleman did not again utter those words in Rivers's presence. (Id. at 159-60). Additionally, another worker at the dealership wore a hat with a Confederate flag on it to work one day; Rivers asked him to take it off and

not to wear it any more, and the worker complied.  (Id. at 165-68).

The most offensive conduct was experienced by Sylvester Cole.  He testified in his deposition that he heard Mark Pitre, the finance and insurance director, remark that there were "too many jungle bunnies running around" at the dealership.  (Dep. of Sylvester Cole, Feb. 22, 2003, Pls.' Ex. 5, at 137-38).  On another occasion, Pitre referred to Cole as "the black boy in the corner," and another time called him "boy."  (Id. at 138-39).  Cole also recounted that he went to a New Year's Eve party in a gated community with Pitre and a finance and insurance manager, Kelly Stelling; as they approached the gate Stelling said, "We'll tell the gate guard that Sylvester's the janitor."  (Id. at 140).  Cole told them the remark was not funny, and they laughed.  (Id. at 144).  On another occasion, Stelling suggested that perhaps the reason Cole had never been to Pitre's home was because there was "no watermelon and no chicken over there."  (Id. at 145).

Plaintiffs have submitted evidence of other incidents and utterances of racial epithets and at the dealership.  (See Dep. of Laura Ruggeri, Apr. 10, 2007, Pls.' Ex. 17, passim (stating that she heard racial terms at the dealership on a "[p]retty much daily basis" and describing those terms and other incidents).  There is no evidence in the record, however, that the Intervenor-Plaintiffs knew of these other offensive events.  According to Plaintiffs' own deposition testimony, they were unaware of the occurrences or the frequency of conduct that Ruggeri described, instead knowing only of the incidents to which they testified themselves.

Although "[a] plaintiff may have a viable hostile environment claim even if the racial remarks were not directed at h[im]," Edwards v. Wallace Community College, 49 F.3d 1517,

1522 (11th Cir. 1995), the plaintiff must have been "aware of the harassing incidents at the relevant time at which [he] alleges [he] experienced the hostile environment," <u>Hudson v. Norfolk Southern Railway Co.</u>, 209 F. Supp. 2d 1301, 1326 (N.D. Ga. 2001).[10]   <u>Accord Brantley v. City of Macon</u>, 390 F. Supp. 2d 1314, 1324-25 (M.D. Ga. 2005) ("Remarks and conduct targeted at others 'may contribute to the overall hostility of the working environment.' A plaintiff 'may also support a claim of hostile work environment by the use of harassing conduct [he] learned of through hearsay, so long as [he] was aware of the harassing incidents at the relevant time at which [he] alleges [he] experienced the hostile environment.") (citation omitted).   In <u>Edwards</u>, the Eleventh Circuit, in affirming the district court's grant of summary judgment on a hostile environment claim, noted that "some of the incidents relied upon were not made known to [the plaintiff] until after her termination and, therefore, could not have contributed to her subjective view of a hostile environment."   49 F.3d at 1522 (citing <u>Harris v. Forklift Sys., Inc.</u>, 510 U.S. 17, 21-22 (1993)); <u>accord</u> <u>Williams v. W.D. Sports, N.M., Inc.</u>, 497 F.3d 1079, 1094-95 (10th Cir. 2007); <u>Cottrill v. MFA, Inc.</u>, 443 F.3d 629, 636-37 (8th Cir. 2006); <u>Wanchik v. Great Lakes Health Plan, Inc.</u>, 6 Fed. Appx. 252, 262 (6th Cir. 2001) (noting that "episodes of harassment concerning other women are probative to plaintiff's experience in a hostile work environment, even if not directed at plaintiff herself" but "plaintiff must have been aware of these incidents during her

---

[10]Many of the cases discussing hostile work environment claims involve sexual harassment rather than racial harassment.  However, the same principles govern these two types of cases.  <u>Nat'l R.R. Passenger Corp. v. Morgan</u>, 536 U.S. 101, 116 n.10 (2002) ("Hostile work environment claims based on racial harassment are reviewed under the same standard as those based on sexual harassment.").

employment, even if indirectly, for the accounts of others to be relevant"); <u>Brooks v. City of San Mateo</u>, 229 F.3d 917, 924 (9th Cir. 2000) ("Harassment directed towards others of which an employee is unaware can, naturally, have no bearing on whether [he] reasonably considered h[is] working environment abusive."). Thus, conduct of which the Intervenor-Plaintiffs were not aware during their employment could not have contributed to the work environment that they experienced.

Considering the conduct of which the Intervenor-Plaintiffs were aware at the relevant time, none of them was subjected to severe harassment that altered his working conditions. Although the remarks heard by three of the Plaintiff-Intervenors clearly are offensive, no physically threatening conduct has been identified; moreover, the remarks of which the Intervenor-Plaintiffs were aware were not frequent, and there is no evidence of "unreasonable interference with job performance." <u>See</u> <u>Mendoza v. Borden, Inc.</u>, 195 F.3d 1238, 1246 (11th Cir. 1999) (noting that factors to "be considered in determining whether harassment objectively altered an employee's terms or conditions of employment [are]: (1) the frequency of the conduct; (2) the severity of the conduct; (3) whether the conduct is physically threatening or humiliating, or a mere offensive utterance; and (4) whether the conduct unreasonably interferes with the employee's job performance") (citing <u>Allen v. Tyson Foods</u>, 121 F.3d 642, 647 (11th Cir.1997) and <u>Harris</u>, 510 U.S. at 23). Carlton Small and Rickey Williams were not aware of any racially charged comments, while Seymour Small heard one comment, reported it, and never heard further comments. Rivers also reported the comments he heard, and they, too, ceased. Finally, while the comments heard by Sylvester Cole were more frequent, direct, and troubling than those experienced by the other

Plaintiffs, Cole himself testified that he "never encountered that through [his] . . . almost four years there until those few incidents" and "it was like a surprise because it – usually it d[idn]'t happen" (Cole Dep., Def.'s Ex. 12, at 149); thus, Cole's experience falls short of what is necessary to give rise to an actionable hostile work environment claim.

In Barrow v. Georgia Pacific Corp., 144 Fed. Appx. 54 (11th Cir. 2005), the Eleventh Circuit held that significantly more compelling facts failed to meet the test for a meritorious claim of hostile work environment.  Affirming a grant of summary judgment for the employer, the Barrow court concluded that where there was evidence of "displays of the rebel flag on tool boxes and hard hats, the letters 'KKK' on a bathroom wall and on a block-saw console, and a noose in another employee's locker," as well as use of racial slurs including "nigger," "boy," and "black boy"; the conduct was nevertheless "isolated," "sporadic," and "random" and did not amount to "severe and pervasive harassment."  Id. at 57-58.  Comparing the instant facts to those of Barrow,[11] even Plaintiff-Intervenor Cole has failed to establish an actionable claim for a hostile work environment.  See also Lusega v. Albrecht & Albrecht, Inc., No. 1:06-CV-0809-JEC, 2007 WL 2226056, at *4 (N.D. Ga. July 31, 2007) (noting that "[c]ases involving more serious allegations than plaintiff's are routinely the subject of summary judgment orders in this Circuit") (citing Barrow and collecting cases).

This conclusion by no means serves to diminish the impropriety of the comments described in the record, but the Intervenor-Plaintiffs may not recover damages based on an environment that may have existed but which they did not experience.  The comments of

---

[11]Although Barrow is an unpublished opinion, it serves as persuasive authority.  See 11th Cir. R. 36-2.

which the Intervenor-Plaintiffs were aware were not frequent or severe enough to be actionable, and the evidence submitted by Plaintiffs does not reveal the existence of a genuine issue of material fact as to whether "the workplace [was] permeated with discriminatory intimidation, ridicule, and insult' that [was] sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment." Harris, 510 U.S. at 21.  Summary judgment is granted to Defendant on Plaintiffs' hostile work environment claims.

### III.  Conclusion

In accordance with the foregoing, it is **ORDERED** and **ADJUDGED** that Defendant's Motion for Summary Judgment (Doc. 48) is **GRANTED in part** and **DENIED in part**.  The motion is **GRANTED** as to Plaintiffs' hostile work environment claims and is **DENIED** as to Plaintiffs' claims of discriminatory termination and demotion.

**DONE** and **ORDERED** in Orlando, Florida this 18th day of October, 2007.

JOHN ANTOON II
United States District Judge

Copies furnished to:
Counsel of Record
Unrepresented Party